2026 IL App (2d) 260052-U
No. 2-26-0052
Order filed May 8, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

ROBERT S. WALDSMITH, Defendant-Appellant.

Appeal from the Circuit Court of Kane County.
Honorable William G. Engerman and Donald M. Tegeler, Jr., Judges, Presiding.
No. 25-CF-1757

JUSTICE BIRKETT delivered the judgment of the court.
Justices McLaren and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in granting the State's petition to deny defendant pretrial release and ordering defendant detained.

¶ 2    Defendant, Robert S. Waldsmith, appeals from orders of the circuit court of Kane County granting the State's petition to deny him pretrial release pursuant to article 110 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/art. 110 (West 2024)), as amended by Public Acts 101-652, § 10-255, and 102-1104, § 70 (eff. Jan. 1, 2023), commonly known as the Pretrial Fairness Act.  We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On July 27, 2025, defendant was charged by complaint with one count of attempt predatory criminal sexual assault of a child ((720 ILCS 5/8-4(a) (West 2024)); (720 ILCS 5/11-1.40(a)(1) (West 2024)), a class 1 felony; one count of indecent solicitation of a child (*id.* §11-6(a)), a class 1 felony; three counts of violating the Sex Offender Registration Act (SORA) (730 ILCS 150/10(a) (West 2024)) for his failure to register a change of address as a sex offender, class 2 felonies; three counts of sexual exploitation of a child (720 ILCS 5/11-9.1(a)(2) (West 2024)), class 4 felonies; three counts of being a child sex offender in a public park (*id.* §11-9.3(a-10), class 4 felonies; and four counts of distributing harmful material to a minor (*id.* § 11-21(b)(1)(A)), class A misdemeanors.

¶ 5     That same day, the State filed a verified petition to deny defendant pretrial release. It asserted that the proof was evident or the presumption great that defendant committed detainable offenses, including attempt predatory criminal sexual assault of a child, sexual exploitation of a child, and child sex offender in a public park, and that his pretrial release would pose a real and present threat to the safety of any person or the community. See 725 ILCS 5/110-6.1(a)(5) (West 2024). The State also outlined defendant's criminal history, including several offenses for which he was sentenced to terms of imprisonment, including a 2001 conviction in Du Page County for predatory criminal sexual assault of a child (eight years in the Illinois Department of Corrections (IDOC)), a 2011 conviction in Cook County for violation of SORA (two years in IDOC), and a 2015 violation of SORA (four years in IDOC). The State also noted that defendant currently was on probation in connection with three offenses, including a failure to register felony and two domestic battery misdemeanors, with probation set to terminate August 13, 2026.

¶ 6     At a hearing on the State's petition, presided over by Judge William G. Engerman, the court admitted three exhibits into evidence: an Elgin police department report, a sworn police synopsis, and an investigative report prepared by the Kane County Child Advocacy Center (Advocacy Center). The police report indicated that, on July 10, 2025, Blaine B. contacted law enforcement to report that defendant had exposed himself to his eight-year-old daughter, L.B. Blaine explained that his wife, Alexis D., worked at a tavern in downtown Elgin, where she developed a friendship with defendant, who was experiencing homelessness. After some time as friends, they allowed defendant to come to their home occasionally to shower and eat. Blaine denied ever leaving L.B. in defendant's care, but he conceded that he did not always have eyes on defendant while he was in their home.

¶ 7     As part of the investigation, an investigator contacted Alexis, who relayed that she and Blaine had "occasionally" allowed defendant to come to their home to shower and eat. Alexis reported that on June 11, 2025, L.B. approached her in the kitchen and stated she was hungry, and defendant told L.B. that she could have a slice of pizza from the pizza box on the kitchen table. At that point, Alexis felt that defendant "was getting too comfortable" with L.B., and Alexis instructed Blaine to send a text message to defendant stating that he was no longer welcome in their home. According to the police report, Alexis later questioned L.B. about her interactions with defendant, and L.B. reported that defendant had exposed himself to her on four separate occasions, had touched himself while defendant and L.B. were alone together, and that defendant had shown her "some videos." Alexis video-recorded this conversation with L.B. Alexis told the investigator that she knew defendant was a sex offender, but that defendant had represented his conviction arose from a relationship with a 15-year-old when he was 17, which the girl's mother opposed.

- 3 -

Alexis reported that she subsequently searched for defendant on the Illinois Sex Offender Registry and discovered that the victim in defendant's prior case was eight years old, the same age as L.B.

¶ 8    The sworn police synopsis provided the following details. On July 24, 2025, L.B. was interviewed at the Advocacy Center. She reported that, beginning in June 2025, defendant babysat her and her younger brother, C.B., on several occasions over the course of a month while her mother was at work and her father went to the tavern to assist her. L.B. reported that, approximately two weeks after he began to babysit them, defendant would show her "his big private parts" nearly every day. She described defendant's penis as "long, black, and under it was hairy." She related that defendant would untie his pants, "stick it out," and would ask her if she liked it, but she would not answer. L.B. explained that "cum comes out of the private part and it would squirt out because he was rubbing his private part with his hand up and down. The cum would go on the ground by his feet." L.B. reported that defendant ejaculated only one time, and that he told her, "[i]t's coming." Other times, while C.B. was asleep, defendant asked L.B. if she wanted to touch his penis, but L.B. always declined. L.B. denied that defendant ever touched her, only that he "touched himself."

¶ 9    L.B. also reported that defendant forced her to watch things on his smartphone that "kids should not see," including "people doing 'doggy style' " who were unclothed. L.B. did not want to see the videos, but defendant demanded that she watch. L.B. reported that this occurred approximately 14 times.

¶ 10    There were also times when L.B. was in her bedroom, and defendant summoned her to the living room, where he was, and she always complied because she feared what defendant would do if she refused. If C.B. was in the room with them, defendant would ask him to leave the room. L.B. stated that, during these incidents, she would be standing and defendant would be seated,

watching the videos and rubbing his penis. L.B. did not tell anyone about these incidents because she feared what defendant would do if he found out. L.B. further reported that she asked C.B. whether defendant ever forced him to watch any videos on his phone, and C.B. told her that defendant forced him to watch a video "of two people" one time.

¶ 11 C.B. was interviewed at the Advocacy Center the following day. He reported defendant had been to his house multiple times, and that defendant showed him a video on his phone one time. C.B. described the video as "seeing a butt."

¶ 12 According to the synopsis, investigators interviewed Blaine, who reported as follows. He and Alexis met defendant at the tavern where Alexis worked, and defendant was a "protector" for Alexis while she bartended. Because of this, they invited defendant to their home so that he could shower. Eventually, they allowed defendant to "hang out" at their home, where they would smoke and drink together. Blaine reported that defendant would come over three or four times per week and would spend the night at their home one or two times per week, which the reporting officer noted was approximately 50 feet from a playground. Blaine knew of defendant's status as a sex offender, but defendant assured him that his sex offense was not as serious as it sounded. Blaine acknowledged that, on several occasions, he left the home to assist Alexis at the tavern, leaving defendant alone with his children.

¶ 13 The synopsis further reported that, on July 26, 2025, defendant was taken into custody without incident when he arrived at the Elgin Police Department to register as a homeless sex offender, which he was required to do on a weekly basis. During questioning by investigators, defendant stated that he "kicked it" with Alexis but denied ever visiting her home or knowing that she had children. He further asserted that he did not know where she lived and denied showering

at her home.  Instead, he insisted that he slept on Big Timber Road "mostly every night" and that he showered only at a local recreation center.

¶ 14    The State argued that the proof was evident or the presumption great that defendant committed the charged offenses, noting that despite L.B.'s tender age, she provided detailed descriptions of sexual conduct, pornographic materials, and biological mechanisms such as ejaculation, which were details that would not normally be within the vocabulary or experience of an eight-year-old child.  The State next argued that defendant's pretrial release would pose a real and present threat to the safety of L.B., her family, and children in the community based on defendant's prior conviction of predatory criminal sexual assault of a child and his repeated failures to comply with SORA.  The State additionally argued that, based on defendant's history of befriending parents to gain access to children and his repeated failures to report as a sex offender, there were no conditions that the court could impose to mitigate that threat.

¶ 15    In response, defendant proffered that he was recently hired as a bus driver, that he helped to care for his mother who was in an assisted living facility, and that he had suitable housing available in Elgin.  In opposing detention, defendant argued that L.B.'s allegations were not sufficiently corroborated, stating that both parents had denied leaving the children in defendant's care, and that the circumstances surrounding the family instructing defendant not to return to their home were unclear.  Defendant acknowledged his lengthy criminal history but emphasized that it consisted primarily of failures to register rather than additional sex crimes, which he argued demonstrated he was not a threat to the community.  Defendant asserted that he could be safely released on conditions, including an order prohibiting him from having any contact with L.B. or her family, that he be prohibited from visiting her home or her parents' workplace, and that he be placed on GPS monitoring.

¶ 16     Following argument by the parties, the trial court granted the State's petition to detain and entered a written order finding that the proof is evident or presumption great that defendant committed a detainable offense, that his pretrial release would pose a real and present threat to L.B. and other children in the community, and that it could impose no conditions that could mitigate that threat.  The court noted that L.B.'s statements appeared believable, because she had "mention[ed] things that normally would not be in the vernacular of an eight-year-old child," including descriptions of an adult penis, masturbation, and video pornography.  The court acknowledged that L.B.'s parents initially denied ever leaving her in defendant's care but commented that "this appears to be a case of adults letting down a minor child," and that "her parents appear to be minimizing their involvement in allowing this defendant to come into contact with their minor child."

¶ 17     The court further found that defendant's pretrial release would pose a real and present threat to L.B. and other children in the community because the instant offense was a crime of opportunity, wherein defendant befriended L.B.'s parents and gained access to her.  The court continued that, based on defendant's prior conviction of predatory criminal sexual assault of a child, his numerous failures to register as a sex offender, and his decision to visit a house only 50 feet from a playground despite being a convicted sex offender, showed that he would "take advantage of a situation to satisfy his desires."  Finally, the court concluded that it could not impose any conditions that could mitigate the threat that defendant's pretrial release would pose to L.B. and other children in the community.  It relied on "defendant's consistent inability to follow the rules and the laws by registering effectively," and noted defendant's prior conviction of predatory criminal sexual assault of a child.  It also determined that electronic monitoring would not mitigate any risk as it would

simply indicate defendant's location but not prevent him from having contact with children or enticing them to his location.

¶ 18    On August 14, 2025, defendant filed a motion for relief pursuant to Illinois Supreme Court Rule 604(h)(2) (eff. April 15, 2024).  He argued that the State failed to prove by clear and convincing evidence each of the elements necessary to detain.  Specifically, defendant asserted that L.B.'s allegations were not sufficiently corroborated by other witnesses,  that the police synopsis was based only on a probable cause standard, which is "significantly lower than the clear and convincing [evidence] standard" required for detention, that his criminal history consisted mostly of failures to register as a sex offender rather than additional sex crimes, and that he could be placed on GPS monitoring.

¶ 19    The court heard defendant's motion for relief on August 20, 2025, with Judge Donald M. Tegeler, Jr., presiding.  At the hearing, defendant rested on his written motion as to the first two prongs but affirmatively argued that the State failed to show that no conditions could mitigate the risk defendant's pretrial release would pose.  He asserted that, despite experiencing homelessness, he could be placed on GPS monitoring, which would ensure that he would stay away from any restricted areas.  He further asserted that his criminal history did not suggest he would not comply with release conditions, noting the difficulty of weekly registration as a homeless sex offender and the fact that his failures to register were nonviolent offenses.  The State responded that defendant's conduct demonstrated that no conditions could mitigate the risk to L.B. and children in the community, noting that defendant had been convicted of sex offenses against a child and was supposed to have no access to children, yet he befriended L.B.'s parents and gained access to her, as well as that he had repeatedly failed to comply with sex-offender registration requirements despite the threat of criminal prosecution.  The State further argued that GPS monitoring would

not protect the community because that condition would only track his whereabouts but not prevent him from victimizing other children.

¶ 20    The trial court denied defendant's motion for relief.  In explaining its ruling, it stated defendant "most likely committed the offense," that he posed a danger to "the two named victims and other children in the same set of circumstances," and that there were no conditions it could impose to adequately protect the community.  It also reviewed defendant's criminal history on the record, noting convictions spanning the last 25 years across multiple counties, including Du Page, Cook, and Kane counties.  The court specifically rejected GPS monitoring as a release condition because it could not craft GPS parameters to protect the children of the state, commenting it could not keep defendant away "from every park in Elgin and Aurora and the tri-cities" or "from every building that a child may be in."  The court further noted defendant's history of failing to register as required by law, and it questioned how it could release defendant on any conditions given that "it doesn't appear that he likes to check in with anybody."

¶ 21    On February 2, 2026, defendant filed a notice of appeal.

¶ 22                                    II. ANALYSIS

¶ 23    Any person charged in Illinois with a criminal offense is presumed eligible for pretrial release, which is governed by article 110 of the Code, as amended.  725 ILCS 5/110-1.5, 110-2(a) (West 2024).  To overcome this presumption, the State must prove by clear and convincing evidence that: (1) the proof is evident or the presumption great that the defendant has committed an offense that qualifies for pretrial detention; (2) the defendant poses a real and present threat to the safety of any person or the community based on the specific articulable facts of the case; and (3) no condition or combination of conditions could mitigate that real and present threat, based on the specific articulable facts of the case.  *Id.* § 110-6.1(e).  Where, as here, the parties to a pretrial

detention hearing proceed solely by proffer, we review the trial court's findings *de novo* (*People v. Morgan*, 2025 IL 130626, ¶ 54)*,* meaning "the reviewing court performs the same analysis that a trial judge would perform" (*People v. Randall*, 2016 IL App (1st) 143371, ¶ 44).

¶ 24　　Defendant did not file a memorandum as authorized by Rule 604(h)(7) and, thus, elects to stand on his motion for relief.　Ill. S. Ct. R. 604(h)(7) (eff. April 15, 2024).　We address only the issues defendant raised in his motion for relief.

¶ 25　　Defendant first argues that the State failed to prove, by clear and convincing evidence, that the proof is evident or the presumption great that he committed the charged offenses.　His argument is twofold.　First, he contends that the State's reliance on a police synopsis is insufficient to satisfy its burden of proving, by clear and convincing evidence, that the proof is evident or the presumption great that he committed a detainable offense.　He describes police synopses as being based on "a probable cause standard[,] which is significantly lower than the Clear and Convincing standard."　Second, defendant asserts that the State did not present sufficient evidence to corroborate L.B's allegations.　These arguments fail.

¶ 26　　Defendant's argument overlooks that section 110-6.1(f)(2) of the Code (725 ILCS 5/110-6.1(f)(2) (West 2024)) expressly permits the parties in a detention hearing to present evidence by way of proffer based on reliable information, and this court has repeatedly held that a police synopsis alone may be sufficient to sustain the State's burden. See, *e.g.*, *People v. Mancilla*, 2024 IL App (2d) 230505, ¶ 24; *People v. Horne*, 2023 IL App (2d) 230382, ¶ 24; *People v. Arroyo*, 2025 IL App (2d) 250058-U, ¶ 34; *People v. Hill*, 2024 IL App (2d) 240436-U, ¶ 29; *People v. Wesby*, 2024 IL App (2d) 230523-U, ¶ 28; *People v. Jones*, 2024 IL App (2d) 230546-U, ¶ 9.

¶ 27　　Additionally, defendant's claim that L.B.'s allegations lacked corroboration reflects a misunderstanding of the State's burden of proof at a detention hearing.　As noted, the State bears

the burden of proving each element necessary to detain a defendant awaiting trial by clear and convincing evidence, which is a quantum of evidence lower than proof beyond a reasonable doubt. Because the testimony of a single witness, if positive and credible, is sufficient to sustain a conviction (*People v. Gray*, 2017 IL 120958, ¶ 36), it necessarily follows that such testimony is more than adequate to support an order for pretrial detention (*People v. Moore*, 2024 IL App (2d) 230494-U, ¶ 12). Accordingly, we reject defendant's contention that the State's evidence at the detention hearing was insufficient "due to the limited amount of corroboration" for L.B.'s allegations.

¶ 28    At the detention hearing, the court admitted into evidence a sworn police synopsis detailing L.B.'s child sensitive interview at the Advocacy Center. L.B. reported that defendant babysat her and C.B. on several occasions while her mother and father were not home. She stated that defendant exposed his penis to her, and she described it as "long, black, and under it was hairy," and she explained that "he would untie his pants a little bit and take it out." She also described defendant masturbating in front of her, explaining that he held his phone with one hand and rubbed his "private part" with the other, and that he ejaculated and said "[i]t's coming." L.B. also related that, on approximately 14 occasions, defendant forced her to watch videos on his cell phone that "kids should not see," including pornographic videos depicting "doggy style." She likewise reported that defendant, while her younger brother was asleep, asked her if she wanted to touch his penis, but L.B. always declined. We agree with the trial court's assessment that, in the absence of sexual abuse, an eight-year-old child would not normally possess the knowledge or vocabulary to describe such sexual conduct in detail, including sexual positions, masturbation, and ejaculation. Moreover, notwithstanding defendant's assertion that L.B.'s allegations were uncorroborated, her six-year-old brother, C.B., likewise participated in a child sensitive interview at the Advocacy

Center, where he similarly reported that defendant, while at the family home, showed him a video on his cell phone depicting a "butt." Accordingly, the State proved by clear and convincing evidence, and the trial court properly found, that the proof is evident or the presumption great that defendant committed a detainable offense.

¶ 29　Defendant next argues that the State failed to prove, by clear and convincing evidence, that his pretrial release would pose a real and present threat to any person or the community. He emphasizes that his criminal history is "filled with failures to report, not with additional acts of actual sex crimes." We are unpersuaded.

¶ 30　Defendant was previously convicted in Du Page County of predatory criminal sexual assault of a child, for which he was sentenced to eight years in IDOC. This conviction establishes that defendant has previously sexually assaulted a child. Taken together with the facts of this case, wherein defendant is alleged to have exposed himself to an eight-year-old child, showed her pornographic videos, masturbated in front of her, and inquired whether she wished to touch his penis, support the trial court's determination that his release would pose a threat to L.B. and other children in the community. As the trial court aptly noted, the facts of this case suggest that defendant befriended L.B.'s parents, which allowed him to gain access to her, notwithstanding the fact that it was unlawful for him to be near children. Accordingly, the State satisfied its burden of persuasion that defendant's pretrial release would pose a real and present threat to L.B. and other children in the community.

¶ 31　Defendant's final argument is that the trial court could have imposed conditions that would have mitigated any purported danger that his pretrial release would have posed. Specifically, he asserted that he could have been placed on GPS monitoring which, in his view, would keep him "out of a restricted area." We disagree.

¶ 32    As observed by Judge Engerman at the initial detention hearing, defendant's criminal history reflects either an unwillingness or an inability to comply with conditions imposed on his release. Defendant has no less than six convictions for violating SORA, with convictions spanning from 2011 (following his release from IDOC after serving an 8-year sentence for predatory criminal sexual assault of a child) to 2023. He spent multiple terms of imprisonment for those violations, including two years in IDOC in 2011 and four years in IDOC in 2015. Additionally, despite knowing he was prohibited from being near a school as a child sex offender, defendant was convicted in 2020 of being a child sex offender while present within a school zone. Thus, defendant's history demonstrates a continual and alarming disregard of court orders through his habitual noncompliance with reporting requirements and geographical restrictions on his whereabouts. Moreover, GPS monitoring would not mitigate the risk defendant's release would pose. As Judge Tegler noted in denying defendant's motion for relief, such monitoring would merely track his location, but it would not prevent defendant from luring a child to his location or entering a private residence where children reside, as occurred here. In short, defendant's criminal history demonstrates that he would not adhere to court orders. The State adequately proved, and the court properly found, that no condition or combination of conditions could mitigate the real and present threat that defendant's pretrial release would pose to either L.B. or other children in the community.

¶ 33                                III. CONCLUSION

¶ 34    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 35    Affirmed.